Okay, we're ready to hear the case and welcome counsel and good morning to you and Miss Nichols, we're ready to hear you. Thank you, your honor. Good morning. My name is Paige Nichols and I represent the appellant Devante Starks. May it please the court. The parties disagree about a lot in this appeal, but we do agree that the district court erred when it that the prosecutor committed misconduct when he told the jurors that the presumption of innocence no longer applied and when he vouched for Toya Avery's credibility. So with those agreements, I would like to leapfrog over an initial error discussion and go straight into the question of harm. And we're dealing with harm from cumulative error, but it might make sense to approach that in a kind of graduated way by starting first with just the preserved, conceded expert testimony issue. Could I ask sort of a framework question on the cumulative error front? And I'm frankly not sure our case law has been crystal clear on this. If we end up in a situation where we have a preserved non-constitutional error with unpreserved constitutional errors, what's the standard that we're applying? I mean, I know the, is it going to be just the typical reasonable probability standard for plain error? Because I mean, this wasn't raised below, right? Or is it going to be the O'Neill standard of substantial influence or some other standard? What standard are we looking at here? Right. I agree. It gets a little complicated. So one reason I thought I would just start with the expert testimony problem is because I think we can reach reversible error there. And that obviously is the government's burden and it is non-constitutional. That's the government's burden to show that that error did not substantially influence the verdict. Then if we need to add more errors like the presumption problem or the vouching or other errors, if the court doesn't find reversible error on issue one alone, then we add in the other errors. And then I have to persuade the court that if the government persuades the court that the first error is harmless, then, and that's under the, you know, didn't substantially influence, that'll look a lot like Chavez, which this court decided recently. And if the government succeeds in convincing this court that that one error standing alone is harmless, then I think I have to persuade the court that the impact of the additional errors substantially influence the verdict. So I think we're talking about- Would it be substantial influence or would it be a reasonable probability? Because I mean, a lot of these harmless error standards are ones in which the burden is on the government. And in this situation, it would appear because you didn't raise cumulative error below that if we do get into a cumulative, and I thought your reply brief was arguing in that sort of vein that under sort of saying, would there be a reasonable probability that this would affect the outcome when you started doing your cumulative error argument? And so I'm just trying to get a better sense. I mean, I know your view is that one, there are errors here that stand alone result in reversal. I'm just trying to get a sense of if we don't end up in that posture, what the review standard would be that we're looking at. So that's interesting because I- Okay. As I'm hearing your honor, maybe the problem arises because cumulative error was not preserved below. Correct. Yeah. So I don't know that I've really seen a discussion of the impact of that on the cases. I mean, most courts cases just kind of say, they go straight to sort of the plain error framework. Is there any authority for the proposition that cumulative error has to be preserved? This I don't know. I don't feel like I have seen that. A lot of times the cumulative error cases come up in like state habeas cases and that's a whole- That's right. You're right. And then you ended up with the argument over essentially, we'd end up with the, I guess, Brecht standard, which is a version of this O'Neill substantial influence standard. Did it substantially influence the verdict or is there grave doubt about that? I don't want to take up a lot of time on this. This is something that I guess we dig in the books and ultimately figure out. And if you don't have a ready answer, I don't want to consume all your argument time. So go ahead, please. Well, I apologize for not having a ready answer. And I know I thought through this at the point of writing the reply brief and didn't find a clear answer, at least in this circuit. But now I'm certainly going to go dig a bit after this argument as well. So when we talk about just the first issue alone, I think probably the easiest way to talk about it is to follow the kind of harm roadmap that this court set out for us in Chavez. The cases have some similarities. They have some differences. But this court walked through three kinds of questions there, all of which are relevant here. And those questions were, what was the role of the evidence that shouldn't have come in? What was the remaining evidence and was it overwhelming? And was there anything mitigating in the instructions, for instance? So here, the expert testimony, it really did permeate the trial and the prosecutor used it to great effect. He used it during his opening statement. He starts out talking about the problem of drugs coming in from Mexico and traveling across the I-70 corridor, these drugs in particular. Then he went into during his opening statement, the prosecutors, I mean, the law enforcement's view of the way the cars were driving, that Mr. Starks was driving as if he knew he was in a decoy vehicle, which showed he knew there were drugs in the other car. And then at closing argument, he uses, well, of course, then the officers testify, and it's a big part of the first officer's testimony. And then in closing argument, the government ends on that very note, the expert testimony. Mr. Starks demonstrated his possession, his control, his intention, all the disputed facts in this case. In the eyes of the trooper, the moment he pulled that decoy vehicle up behind Trooper Goheen. So it gets used throughout the case. Opening statement, evidence, closing argument. What about the rest of the evidence? And I want to, again, emphasize, this is the government's burden here on this one issue. And I also want to emphasize that we're not looking to see whether the rest of the evidence, if you remove the improper expert testimony, we're not asking if the rest of the evidence was sufficient. We're asking if it was with a few comparisons to Chavez. Here, like in Chavez, there's no direct evidence of Mr. Starks' possession of those drugs. And unlike in Chavez, here we don't even have a cooperating witness or co-defendant putting the drugs in his hands. In Chavez, the two cooperating witnesses put Mr. Chavez in the car where the drug transaction took place and put the drugs in his I can't tell you whether he possessed those drugs. I never saw the drugs. I don't know anything about those drugs. So we're a step farther away here. We also, of course, have no forensic evidence, no surveillance evidence showing Mr. Starks engaged in drug transactions. Of course, no confessions. And then we have the problem of Toya Avery's credibility. The jurors had a lot of questions about this case. There was no jury instruction to not to disregard the expert testimony because, of course, the court thought it was perfectly admissible. And we have the jury deadlock, which I think also weighs in favor of a view that the evidence was not overwhelming, that at least some jurors found Toya Avery's credibility questionable. Some other questions about the case that left them without a belief beyond a reasonable doubt with respect to. Of course, there's another way to view the jury deadlock, which the government argued that it suggests that they were able to discern and evaluate and weigh the evidence appropriately. One thing that's curious about that outcome on the conspiracy charge is how linked, in some ways, it would seem to have to be to the other two charges, since there were no drugs on your client. And so it leaves one as a head scratcher as to if they didn't find that they conspired together and he didn't have drugs on his person, how it came to be that they would deadlock on that. So I don't know how much we can make of jury deadlocks, but go ahead, please. Right. So, I mean, I don't think it supports the government's argument about the deadlock here, because this isn't like a case where maybe you have a case with money laundering counts and tax counts, and they have completely different categories of evidence. And I think was just pointing that out, that here, the government relies on the same body of evidence for all three counts, but only gets a conviction on two of them. So that sounds like a compromise verdict to me. And remember, this jury came back with several questions about the evidence. So this was not like a quick guilty verdict like we might see in other cases. I don't want to derail you entirely, but there's one point I want to get at before you end. And this relates to the January 2019 warrant and what I understood to be your hearsay argument based upon the information that came in relative to the drugs in the house that supported the warrant. Why, since that testimony initially came out during cross-examination, why wasn't the door open to the government's later response such that one could deem that in some sense to be right to question there? Because if I understood what was going on, cross-examination was designed saying, hey, look, my guy didn't have drugs in his house. And so what inference should there be that, in fact, he possessed the drugs the other time? Well, the government wants to point out and retort that, well, there was a foundation, probable cause foundation for that warrant where they didn't find drugs. So my question is, why didn't the lawyer open the door to that line of questioning? I completely agree. I completely agree that the lawyer opened the door to the subject matter. But when you open the door to a subject matter, I don't believe there's any legal authority for the proposition that you open the door to illegal evidence. Well, you don't open the door to the kitchen sink. But I mean, but if the point is, if the whole theory of the cross-examination was to exculpate, in some sense, through inferences that there were no drugs in the house, then why wouldn't they be able to say, well, yes, there was a basis for the warrant that there were drugs in the house? And I think that basis just needed to come in through the officers themselves, not through their hearsay. If I could reserve the opportunity to ask a question, I would like to ask a question to Mr. Brown. Mr. Brown, do you have a ready answer to the cumulative error standard of review question? I don't have a ready answer, unfortunately. I think I would just point the court to the standard the court set forth in the Cristerna-Gonzalez case at 962-F3-1268. You look at the preserved errors that are cumulatively harmless. You combine those with the unpreserved but conceded plain errors, and then figure out if they overcome the hurdles necessary to establish plain error. The plain error standard is whether it affects substantial rights. The court asked, well, what if there's a constitutional error in there? Then there's just more relaxed standard. So we think that's sort of where the guideposts are on that question. So, and to the point that Judge Lancero raised earlier, is it your view then that cumulative error is something that has to have been preserved below, such that it would be subject to the plain error standard? Well, I think the standard is already a plain error standard. And we haven't- I mean, they're embedded errors that are subject to the plain error standard. I get that. But I mean, you know, but the point is, in the aggregate, when you're doing the cumulative error analysis, is that their burden to prove? And I'm not going to belabor it unless you have a ready answer. I don't have a ready answer, Your Honor. I quite frankly hadn't thought about that as being a line of defense for us. If somebody hadn't raised cumulative error below, I'll give it some thought and some research after this argument, of course. All right. It strikes me, for these purposes today, that you wouldn't have to preserve a cumulative error because basically at that point, you don't even know what error is going to be ruled on. It just strikes me as overly formalistic. But I'd like Judge Holmes and I'm sure that all our court would want to know if there's any authority on the proposition that it does have to be preserved. I sure would like to see it. I'll look for that authority after the argument, Your Honor. Court's point is well taken. Mr. Brown, what evidence was there to corroborate Ms. Avery? I mean, her testimony was, it seemed to me anyway, a fairly critical link in establishing the guilt of the defendant, particularly since the defendant had no drugs in his car and particularly since there was improper vouching as it relates to her. In the closing argument of defense counsel, they ticked off all of the things that were not, as they perceived it, available. Hotel receipts, because what I'm talking about now is the pre-stop drug transactions that were alleged, but they provide the predicate for a reasonable jury to think, well, this guy's a drug dealer, and so why wouldn't this be another drug transaction? Well, if there are no hotel receipts, if there are no airplane tickets, if there's nothing but her unvarnished word, why isn't that problematic? Well, the jury's, you know, some witnesses you don't get a lot of corroboration for. You know, somebody can view a bank robbery and their testimony won't be corroborated. That's on the government. You could have, I mean, the government could have gone into the hotel that she said they stayed at or they could have gone to and purchased the, I mean, gotten the tickets of the airplane or whatever she said they flew on. I mean, those things are easily verifiable, aren't they? Well, sometimes they are and sometimes they're not. Sometimes it's easier said than done. I don't know if in this case the agents made the effort. They obviously should have if they didn't, and you're probably correct. Your Honor's probably correct. We could have presented that. The fact is that we didn't. What effect does that have? Well, we don't think that her testimony is necessarily dubious just because she was offered a plea deal in exchange for providing truthful testimony. We agree that this court has said that somebody who gets a deal in exchange for testimony, that their testimony is open to court, instructed the jury that it should consider her testimony with caution. Her testimony was never contradicted. Her testimony was never controverted, and we don't see that there's any problem with her credibility. Certainly it was not dubious. There's no problem with her credibility? That's what she lied about. She lied about knowing the other people in the other car. She said she's lied in the past. I mean, this is the woman who said she was sick and left the case. Is that her? Your Honor, is that the person we're talking about? The court's point is well taken. The court's point is well taken. What we're saying is that a person like this, they often testify in our trials. Somebody who gave a false statement at the very beginning and then gives another statement and testifies under oath, those prior statements were not under oath. This demeanor, got to consider her diction, her syntax, the way she put things. Keep in mind also that she didn't put any drugs on the defendant from the trip to Anaheim, California. Which is a problem for you. I mean, that's one other thing that didn't happen. It's not as if she said, yes, those drugs that were in the car were his, Brian. Well, but if she were going to lie and she were going to give us testimony that wasn't true, she would have put the drugs on him, but she didn't. I mean, we think that that shows more credibility rather than less credibility and helps our case on appeal rather than hurts it. Now, if I may, the court did ask what was there anything to corroborate her testimony? There was a little snippet and we talk about that on pages 22 to 23 and note two of our brief that before Avery and Scott's first trip to Arizona to buy drugs from the defendant, Scott said that he had a new plug or supplier of heroin. So the guy who cut his hair said that his brother would be getting out of jail and would be the new source for the drugs. And it turns out that the brother of the guy who cut his hair turned out to be the defendant. And the brother testified at the trial and admitted that the defendant that he cut Scott's hair. So we have that in footnote to Scott's hair that he did anything else relative to Scott or to brother. I mean, to his own brother, the defendant, the brother, the brother cut Scott's hair and the brother said that his the brother said that his the brother who cut Scott's hair said that his brother, who was the defendant, was getting out of jail and would be the new plug for marijuana. I mean, for heroin. So that's on footnote two of our brief and also page 22, the first bullet point. But the court did ask whether there was corroboration. There was. I know. I appreciate it. I'm glad to have that highlight. Go ahead, please. Now, getting to the to the harmless air issue, we think that the harmless air issue or the cumulative air issue, we think that that we think that we have the better part of that argument for a couple of reasons. Number one, and I'd like to preface this by saying we apologize for the vouching. We do not condone the vouching. We condemn it. There's no excuse for it. We're working on it. We're horrified every time it happens and we apologize for it. That being said, in this case, the court right after the prosecutor vouched for the truth of Avery in closing argument, the court immediately corrected the air and said, don't listen to what the prosecutor says on the believability of witnesses. That's for you to determine right after he said it. So, yeah, but then the prosecutor, if you continue along in that passage, did some more vouching. It was so it was it was, I mean, not as not as unvarnished, but continue to support her testimony in ways that struck me as being fairly problematic. I mean, I can take the time to pull them up, but I won't. I mean, it's so even if, you know, I admit we presume that the jury follows the instructions of the court and the court did admonish, well, did address that issue. But OK, so you're suggesting that undercuts the harm. I mean, the harmfulness of the vouching, right? Absolutely. Absolutely. And plus the fact that here the court right after the vouching occurred, the court said the jury will ignore what the prosecutor says in terms of truthfulness. The court said that's your determination to make, not counsel's right after it was made. So it was immediately cured and the defendant didn't object to the way it was cured. So it doesn't get any better than that in the legal world as far as curing an error, especially a vouching error. That's when it should be cured. And here it was cured. What about the presumption of innocence error, which struck me as being fairly problematic? What's the story there? The story, the story on the presumption of evidence. And again, just to remind the court, the statement was the prosecutor said the presumption has been changed based upon substantial weight of credible evidence and was no longer true. It was really maladroit phrasing. It could have been taken two ways. The first way it could have been taken was that the presumption has been factually rebutted. The second way it could have been taken is that is the prosecutor was saying the presumption no longer legally applied, which was incorrect. Now, in our briefing, we we go with a second interpretation because that's the one that's the most beneficial to the defendant and the fairest to the defendant. And we concede that was error. Now, we think also that that that the court gave instructions saying that the presumption of innocence remains with the defendant. It did before the presentation of evidence. And let me ask you, is that a common practice in the District of Kansas? I really I really haven't seen that. I've never seen that. I haven't seen that very often. And does not that create in the context of determining the and going to going to your point about the immediacy of the response to the vouching on Miss Avery, you've got a gap of time between here's a presumption of innocence. This is you know, this exists. And then you've got two days later, the prosecutor saying, well, you know, the presumption of innocence disappears. I mean, that's that's problematic, isn't it? Well, it's it's not it's not problematic from a it's problematic from a primacy and recency standpoint. Yes, that resolves the question. The question is whether it's legally problematic. And we think that it's not because this court presumes that juries are juries follow their instructions here. The jury was given the instructions and they're presumed to follow those. They were given the instructions before the trial and after the trial. They have the instructions with them in the jury room. And this court presumes they follow the instructions. See footnote six in my brief, including even when there has been misleading argument. That's on that's on footnote six in my brief. Well, this was this implicated a constitutional right. This isn't the typical or the more common prosecutorial misconduct based upon just sort of a due process fairness of the trial situation. This one implicates his his Fifth Amendment rights. And it seems to me that I think the law treats that differently, does it not? Well, the court looks at that under the plain air analysis. The court looks at that a more relaxed standard. Yes. The standard right now is whether it affects substantial rights. The court obviously can can look at it under a more relaxed standard as the court is suggesting that it should be. We agree it affects the constitutional rights. We apologize for the misstatement. I'm not I'm not asking you to apologize now. I'm just getting at I'm just trying to understand the harmfulness of it. And how about the argument that she made about or that the that the defendant makes about the lack of definition of trial? It seems to me that's not insignificant, because if she or at least arguably it's not, because even if they had the jury instructions in the back, what why when they're deliberating, why couldn't they permissibly think that, hey, the prosecutor was right now? The you know, we can eliminate the presumption because the trial's over. Well, we'd have to look for some law on that point. We get we'll acknowledge the court court makes a fair point and and we can see how the court's failure to provide that definition could could constitute lack of guidance for the jury. But but, you know, they're in the trial. The trial is over until the verdict is rendered. And and so there's you know, you have that. But you know, the court is the court is looking at the harmfulness. If I could just point out two number one, you know, I go back to that presumption that juries follow their instructions. That is that is just a bedrock presumption in this court's in the Supreme Court's jurisprudence. And that's what we're relying on. But number two, keep in mind also that the jury acquitted on count one. And and as this court said in the in the Christie case, the fact that it acquitted on one count of several shows that they were able to follow the instructions and they were able to we think that means the jury was not unfairly swayed by any misleading argument or any vouching or any any non harmless errors. If the jury was able to separate the evidence as far as the counts and actually acquit on counts, we think that shows that the jury was able to look at these things individually, figure out the figure out if the elements were met on those counts, decide if they were met and come to an agreement. Well, going back to Miss Nichols point, given the interlocked evidence here, it's not clear to me at all that that's not an illogical verdict. And I mean, if there are no drugs in the car that the defendant is driving and he's being prosecuted for possession of those drugs, possession with intent to distribute, it would be hard to imagine. Well, there are some circumstances, but there'd be limited where he wasn't conspiring with the people who were driving the car. I mean, so I mean, how much that gets you because the evidence is so interconnected. How does that show that they exercise discerning judgment? Well, if they if they were swayed by all of the harmful errors here, then they would have just convicted on everything. That's that's why that's our point. But they weren't swayed because they didn't convict on everything. So that shows that they were able to use their reasoning and use their judgment. And I see that my time is up unless the panel has any more questions. I hear none. Your time is up. Thank you, counsel. I just want to point out maybe in response to something that Judge Holmes had asked about the jury instructions on the presumption of innocence, something that I think might be a little bit useful to the court. I think the court understands my point about the instructions just say through the trial without describing the trial. And and I combed that record. I didn't see anything in there where trial where the judge talked to the jurors about trial and deliberations were clearly and obviously included in that definition. But what I wanted to point out is the Medlin case where a defendant argued that the failure to define trial in that instruction to explain that it needs the presumption carries through deliberations was not a basis for reversal there. And the court distinguished between having a less clear instruction from affirmatively telling the jurors that the presumption is over. And one reason that the instruction was not as problematic there, and again, mainly because you didn't have the prosecutorial misconduct that we have here. But another reason in Medlin that the instruction wasn't problematic in failing to describe how the presumption carries through deliberations is because there was a question or something after the jurors were already in deliberations and the court instructed them during deliberations and restated the presumption of innocence during the deliberations in Medlin. So that. Is that one of our cases? That's a Tenth Circuit case, yes. And I believe it is cited in my opening brief at some point. That's M-E-D-L-I-N. So again, that one was about the failure to instruct more clearly, not misconduct. And I'm happy to answer any other questions, but I think as I said when I started, we get to reversible error one way or another. The question about the standard for cumulative harm is interesting, and I will look into it. But again, the court maybe doesn't even need to get there. Thank you, counsel. Counselor excused. The case is submitted.